UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAREN W. MARTHALER

           Plaintiff,                    Civil Action No. 11-cv-15315

    v.                           District Judge David M. Lawson
                                   Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

           Defendant.
_____/

**REPORT AND RECOMMENDATION TO
GRANT IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [9] AND
DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [10]**

Plaintiff Daren Marthaler appeals Defendant Commissioner of Social Security's ("Commissioner") denial of his applications for Disability Insurance Benefits and Supplemental Security Income. (*See* ECF No. 1, Compl.; ECF No. 7, Transcript ("Tr.") 11.) Before the Court for a Report and Recommendation (ECF No. 3) are the parties' cross-motions for summary judgment (ECF Nos. 9, 10). Plaintiff asserts that the disability decision must be reversed because the Administrative Law Judge ("ALJ") failed to give the required "good reasons" for rejecting the opinion of his treating source. (ECF No. 9, Pl.'s Mot. Summ. J. at 3-10.) The Commissioner urges the Court to affirm the denial of benefits because "the ALJ had several good reasons for rejecting [the treating source's] extreme limitations." (ECF No. 10, Def.'s Mot. Summ. J. at 11.) For the reasons set forth below, this Court finds that the ALJ did not adequately explain why he rejected the opinion of Plaintiff's treating psychiatrist. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 9) be GRANTED IN PART, that Defendant's Motion for

Summary Judgment (ECF No. 10) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## I. BACKGROUND

Daren Marthaler is 29 years old. (Tr. 157.) He was in special education in grade school and completed the seventh-grade. (Tr. 48.) Plaintiff last worked full time for a pizza chain where he washed dishes, cleaned the machines, and made pizzas. (Tr. 53.) At the time of the administrative hearing, Plaintiff was still working 25-30 hours per week at the pizza place. (Tr. 53.) He maintains, however, that symptoms associated with his diagnosed attention deficit hyperactivity disorder ("ADHD") and intermittent explosive disorder prevent him from working full time. (*See* Tr. 44, 53.)

### A. Procedural History

Mr. Marthaler applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on May 1, 2007. (Tr. 11.) Through application amendment, he asserts that he became unable to work on January 1, 2002, when he was 19 years old. (Tr. 11, 157.) The Commissioner initially denied Plaintiff's disability applications on August 27, 2007. (Tr. 11.) Plaintiff then requested an administrative hearing, and on December 3, 2009, he appeared with counsel before Administrative Law Judge Troy M. Patterson, who considered his case *de novo*. (Tr. 11-24, 38-64.) In a February 23, 2010 decision, ALJ Patterson found that Plaintiff was not disabled. (*See* Tr. 11-24.) His decision became the final decision of the Commissioner on October 14, 2011 when the Social Security Administration's Appeals Council denied Plaintiff's request for review. (Tr. 1.) Plaintiff filed this suit on December 5, 2011. (ECF No. 1, Compl.)

2

### B. Plaintiff's Education Records

The administrative record contains some of Plaintiff's education records.  In the seventh grade, Plaintiff was disciplined multiple times for, among other things, inappropriate language, disrespect, and insubordination.  (Tr. 178.)  His achievement test scores were in the average range in reading but in the below average range in mathematics and language.  (*See* Tr. 180.)  Plaintiff's composite IQ score was at the 62nd percentile (better than 62 percent of his peers).  (Tr. 189.)  His short-term memory score, however, was below average.  (Tr. 190.)  One of Plaintiff's teachers also noted "some difficulty with short term memory" and that Plaintiff had difficulty "remembering skills learned the day or two before."  (Tr. 195.)  Plaintiff's individualized education plan included two to three hours of special education per day.  (Tr. 184, *see also id.* 181-87.)

### C. Medical Evidence

#### 1. *Plaintiff's Treatment with Dr. Michael Ossian*

From ages 14 to 17, Plaintiff treated with Dr. Michael Ossian, a psychiatrist.  (Tr. 289-310.) The treatment records reflect cycles of worsening symptoms, medication changes, and improving symptoms.  Plaintiff first visited Dr. Ossian in January 1997.  (Tr. 308-10.)  After reviewing Plaintiff's medical history and reports from teachers, Dr. Ossian's impression was that Plaintiff had ADHD "which may or may not be superimposed on a mood disorder."  (Tr. 308.)  He changed Plaintiff's medication from Ritalin to Dexadrine.  (*Id.*)

In March 1997, Plaintiff or his mother reported a number of impulsive behaviors such as taking an antique knife that belonged to Marthaler's father and playing with matches.  (Tr. 307.) Plaintiff's mother believed, however, that Plaintiff had become "more controllable" and less irritable since beginning on Dexadrine.  (*Id.*)

In June 1997, Plaintiff reported to Dr. Ossian that he had passed the seventh grade.  (Tr. 304.)  His parents were impressed with how much Plaintiff had learned during the school year, but Plaintiff's mother noted that the Dexadrine had not been working as well as it had been.  (Tr. 304.)  Dr. Ossian increased the dosage.  (*Id.*)

At the start of the new school year, Plaintiff's mother reported to Dr. Ossian that his classroom was noisier than the year before, and Plaintiff reported that he was having some difficulty concentrating.  (Tr. 303.)  Dr. Ossian increased Plaintiff's dosage of Dexadrine.  (*Id.*)

In or around February 1998, Plaintiff began home schooling, and his mother noted that he was "more obnoxious than he's ever been," including aggressive behavior.  (Tr. 302.)  Dr. Ossian changed Plaintiff's prescription to a combination of Zoloft and Adderall.  (*Id.*)  In March, Dr. Ossian increased the dosage, and, from May through December 1998, Plaintiff reported feeling "somewhat calmer" with increased focus.  (Tr. 298-01.)

In April 1999, however, Plaintiff's mother told Dr. Ossian that Marthaler was irritable in the mornings and having difficulties getting out of bed.  (Tr. 296.)  Dr. Ossian increased Plaintiff's Zoloft prescription.  (*Id.*)  Plaintiff remained irritable, however, and, in May 1999, also reported that it was harder to stay focused.  (Tr. 295.)  Dr. Ossian increased Plaintiff's Adderall and Zoloft prescriptions.  (*Id.*)

In June 1999, Dr. Ossian remarked, "unfortunately, Daren has reportedly gotten worse in the last few months — even more irritable, easily angered [and] still abusive toward his siblings [and] even his parents ([especially] his mother) at times."  (Tr. 294.)  Dr. Ossian discontinued Adderall

and began Plaintiff on a trial of Depakote.  (Tr. 294.)[1]

In October 1999, Plaintiff reported being "calmer" with fewer outbursts.  (Tr. 292.) Plaintiff's co-workers also noted that Marthaler seemed more focused.  (*Id.*)  Dr. Ossian indicated that Plaintiff's mood was "stable" or "improving."  (*Id.*)

In April 2000, however, Plaintiff reported that his medication was not working anymore and that, recently, he had been "very short-tempered" and easily aggravated.  (Tr. 290.)  Dr. Ossian increased Plaintiff's Depakote prescription.  (*Id.*)

At his last visit to Dr. Ossian in June 2000, Dr. Ossian noted that Plaintiff was still having "outbursts." (Tr. 289.)  Plaintiff's mother expressed concern that Plaintiff would turn 18 shortly but was not "ready to be fully independent"; she was specifically concerned about Plaintiff going away to a work-training school.  (*Id.*)  Dr. Ossian recommended that Plaintiff and his parents see a clinical psychologist and began Plaintiff on a trial of Wellbutrin.  (*Id.*)

### 2.  *Plaintiff's Treatment at Bay Arenac Behaviorial Health*

In October 2006, family or friends referred Marthaler, then 23 years old, for treatment for anxiety, depression, and suicidal ideation.  (Tr. 330.)  Plaintiff was not taking any medications at the time.  (Tr. 335.)  Elizabeth Killough, a licensed counselor at Bay Arenac Behavioral Health, performed a mental-status exam.  (Tr. 334.)  Plaintiff told Killough that he was having suicidal thoughts (but no plan) due to his insecurity of being a father.  (Tr. 334.)  Killough noted that Plaintiff

---

[1]Valproic acid, the general name for Depakote, "is used alone or with other medications to treat certain types of seizures. Valproic acid is also used to treat mania (episodes of frenzied, abnormally excited mood) in people with bipolar disorder (manic-depressive disorder; a disease that causes episodes of depression, episodes of mania, and other abnormal moods)." AHFS Consumer Medication Information, Valproic Acid, http:// www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000677/ (last visited September 24, 2012).

appears "reasonably intelligent, yet has difficulty due to his anxiety and decision[-]making processes." (*Id.*) She diagnosed Marthaler with major depressive disorder, recurrent and assigned him a Global Assessment Functioning score of 45. (Tr. 335-36.)[2]

In the first-half of November 2006, Plaintiff reported to Killough that he had been successful in controlling his anger. (*See* Tr. 344, 346.) He described an incident where he wanted to shoot his neighbor's dogs (for shredding trash in his yard) but instead called animal control. (Tr. 346.) He also reported making some money doing roofing jobs. (Tr. 344.) Killough noted, "[c]learly, he is serious about making progress with his anger control, his fatherhood, and his steps towards mature behavior." (Tr. 345.) At the end of November, however, Plaintiff was at a mall and saw someone shaking his daughter; he confronted the individual and the incident ended with Marthaler being removed by security. (Tr. 340.) Plaintiff expressed to a Bay Arenac social worker that he was hesitant to try medications because of his experiences with it when he was younger; Plaintiff nonetheless agreed to try medication if a doctor adequately explained it. (Tr. 340-41.)

Accordingly, in February 2007, Plaintiff (with his two-year-old daughter) saw Dr. Marina Bogdanovic at Bay Arenac for a psychiatric assessment. (Tr. 320-23.) Plaintiff told Dr. Bogdanovic that, in a perverse manner, he enjoyed his anger; he explained that his anger was a good stress release and that he enjoyed hitting someone or getting hit. (Tr. 320.) Plaintiff denied ever

---

[2]A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." *American Psychiatric Assoc. Diagnostic and Statistical Manual of Mental Disorders* ("*DSM–IV*"), 30-34 (4th ed., Text Revision 2000). It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 32.

A GAF score of 45 to 50 reflects "serious symptoms (e.g. suicidal ideation, severe obsession rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *DSM-IV* at 34.

physically abusing his daughter, however, and stated that he enjoyed spending time with her. (Tr. 321.) Plaintiff reported that his medications were changed frequently as a youth and that they often caused nausea or vomiting. (Tr. 321.) He expressed resentment toward his mother for making him take the medications. (*Id.*) Upon performing a mental-status exam, Dr. Bogdanovic found that Plaintiff had difficulties focusing on one topic at a time as well as "significant intermittent explosiveness." (Tr. 322.) Dr. Bogdanovic diagnosed "ADHD combined type, Intermittent Explosive Disorder" and assigned Plaintiff a GAF score of 50. (*Id.*) Plaintiff agreed to trial of Strattera, an ADHD medication. (*Id.*)

In March 2007, Plaintiff had a followup exam with Dr. Bogdanovic. Plaintiff reported improvement in his anger and irritability. (Tr. 325.) Upon performing a mental-status exam Dr. Bogdanovic noted that Plaintiff's "focus and concentration appeared to be good." (Tr. 325.) Dr. Bogdanovic increased Plaintiff's dosage of Strattera and scheduled a followup exam. (*Id.*)

In May 2007, Plaintiff returned to Dr. Bogdanovic. (Tr. 324.) He reported ongoing irritability and anger. (*Id.*) He also told Dr. Bogdanovic that his focus and concentration were marginal. (*Id.*) On exam, Dr. Bogdanovic determined that Plaintiff's concentration and focus were "fair." (*Id.*) She increased Plaintiff's Strattera prescription. (*Id.*) Later in May, Plaintiff reported to a Bay Arenac counselor that his medication was helping control his anger outbursts, but not helping with his depression. (Tr. 339.)

It appears that sometime in November 2007, Plaintiff began seeing, or intended to begin seeing, Brenda Rousse, a licensed social worker at Bay Arenac. (*See* Tr. 408-19.) The administrative record, however, contains no counseling records with Rousse from November 2007 to November 2008. And even after that, Plaintiff cancelled or failed to show for a number of

appointments.  (Tr. 382, 385, 386, 387, 396, 397.)  In November 2008, Rousse performed a mental-status exam and determined that Plaintiff's concentration and attention were "good."  (Tr. 404.)  In January 2009, Plaintiff reported to Rousse that he had not been taking his medication and had been terrifying his girlfriend and children with his temper.  (Tr. 388.)  In March 2009, Plaintiff reported to Rousse that he did not like how his new medications were making him feel, and stated that he was irritable and afraid of hurting someone.  (Tr. 383.)

It appears that sometime in the first-half of 2009, perhaps as early as January 2009, Dr. Harold Lenhart at Bay Arenac began managing Plaintiff's medications.  (Tr. 381; *see also* Tr. 383, 388.)  In June 2009, Plaintiff expressed frustration to Dr. Lenhart about a recent event: he had gone on two interviews for a job, thought he had been hired, then, on the first day of work, found out that a different supervisor had hired others.  (Tr. 381.)  Nonetheless, Plaintiff said that his medication had been helping and that, save for significant events like the hiring mixup, he had been less angry and irritable.  (*Id.*)

In August 2009, Plaintiff reported that he had been working 40 hours a week but the job was hard.  (Tr. 379.)  Although Plaintiff still felt anger and irritability, he thought that the prescribed medication might be the best available.  (*Id.*)

In November 2009,  Rousse reported to Lenhart that Plaintiff had recently been in an angry mood and had thoughts of harming himself and others.  (Tr. 427.)  Plaintiff reported to Dr. Lenhart that despite recent anger over a medication bill and some physical sickness from the medication, he believed that Dr. Lenhart was on the right track with the medication.  (Tr. 427.)

On December 18, 2009, Dr. Lenhart met with Plaintiff "about his upcoming disability hearing."  (Tr. 428.)  Dr. Lenhart conducted a mental-status exam which revealed that Plaintiff was

irritable and "somewhat hostile." (Tr. 428.) Dr. Lenhart found that Plaintiff's thoughts were "logical," but that Plaintiff had "some difficulty attending and concentrating." (*Id.*) He also included the following addendum to his office notes:

> Later in the afternoon I spoke with [Mr. Marthaler's] attorney . . . and answered questions about his functional capacity and need for disability. In conclusion, I do not believe he is capable of entering full time into the work force. I do not believe he is capable of working in proximity to others, to attend or concentrate for extended periods of time[,] or to accept any form of criticism or disruption of routine. Therefore, I believe that he does qualify for total and permanent disability status.

(Tr. 428.)

### 3. Opinion Evidence

In August 2007, Dr. Wayne Hill, a psychologist, reviewed Plaintiff's medical file and completed Psychiatric Review Technique and Mental Residual Functional Capacity Assessment forms for Disability Determination Services. (Tr. 354-71.) Dr. Hill found that Plaintiff had less than "marked" limitations in each of the four "B" criteria for certain mental impairment listings. (Tr. 364.) He also found that Plaintiff had no "marked" limitations in any listed mental residual functional capacity category. (Tr. 368-69.) Dr. Hill explained,

> Claimant's understanding and memory are moderately limited due to ADHD. Claimant's capacity for sustained concentration and persistence is moderately limited. Concentration may vary and may limit pace. Claimant may have trouble with complex or technical tasks due to pressure of demands and difficulties with concentration. Claimant's ability to adapt is moderately limited due to features of an intermittent explosive disorder (IED). However, adaptation is within adequate limits. . . . Social interactions are moderately limited due to effects of [IED]. Claimant may do better in smaller groups or alone, under circumstances in which social and other demands are reduced or significantly minimized. . . . Claimant retains the mental residual capacity to perform step one and step two tasks on a sustained basis.

9

(Tr. 370.)

More than two years later, in December 2009, Dr. Lenhart provided a functional capacity assessment of Plaintiff. (Tr. 437-42.) Dr. Lenhart opined that Plaintiff would have "difficulty working a regular job on a sustained basis due to poor concentration[] [and] hypersensitivity to criticism and irritability. He may become easily angered by his co-workers and verbally strike out." (Tr. 439.) In contrast to Dr. Hill's "B" criteria ratings, Dr. Lenhart provided that Plaintiff was "marked[ly]" limited in maintaining social functioning. (Tr. 440.) Dr. Lenhart further provided that Plaintiff would be "marked[ly]" limited in the following mental residual functional capacity areas: (1) his ability to maintain attention and concentration for extended periods, (2) his ability to work in coordination with or proximity to others without being distracted by them, (3) his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, (4) his ability to accept instructions and respond appropriately to criticism from supervisors, and (5) his ability to respond appropriately to changes in the work setting. (Tr. 441-42.)

**D. Testimony at the Hearing Before the ALJ**

Plaintiff, his mother, and a vocational expert each testified at the administrative hearing before the ALJ.

### 1. Plaintiff's Testimony

Plaintiff testified to how his ADHD and intermittent explosive disorder prevent him from working full time. He said that the dishwashing was "pretty easy" for him, but felt stress when performing other parts of the job: setting tables for customers, dealing with the waitresses, and dealing with other people. (Tr. 49.) He stated that he "would get nasty and verbal with other

10

employees there." (Tr. 49.)  Similarly, Plaintiff testified that he tried working full time at the pizza place but "it got very stressful for me where I pretty much kind of had like an emotional breakdown." (Tr. 53.)

Plaintiff also described some other symptoms of his intermittent explosive disorder.  He testified that a psychiatrist suggested that he not obtain a driver's license because he might not handle stressful situations in traffic and might "get into a situation where [he] injured [himself] or other people . . . ."  (Tr. 55.)  Plaintiff also explained that he gets "very irritable" about life situations.  (Tr. 55.)  He provided the following example: at a store he verbally assaulted a parent who disciplined their child in a manner he disagreed with; this led to his removal from the store. (Tr. 55-56.)  Plaintiff stated that he lost his temper "daily [or] every other day."  (Tr. 56.)

### 2. Plaintiff's Mother's Testimony

Deborah Marthaler, Plaintiff's mother, also testified in support of her son's disability claim. (Tr. 56-62.)  She explained that Plaintiff had a short temper since kindergarten and, as it progressed into adulthood, it manifested as "verbal abuse," "very bad language on a normal basis [for] the smallest of things," and threats to kill people or hurt himself.  (Tr. 57.)  She stated that "if he's trying to concentrate on something and someone's doing something else[,] like maybe . . . typing[,] . . . [that] might just throw him off enough that he would have an explosion and get up and cuss [the person] out."  (Tr. 57.)

Regarding Plaintiff's ability to concentrate, Deborah Marthaler testified,

> If you give him one task and there's no distractions, he could
> probably do that task.  But the minute you start throwing four or five
> things and he has to hurry and there's people doing stuff over here
> and there's people doing stuff over here, then he gets frustrated.  And
> he can't do what he's doing and then you end up with the behaviors.

11

(Tr. 59.)  She continued,

> My only thing for him is of course every parent wants their child to
> be successful and to be able to succeed.  And I think in some ways
> Daren would be very good with things in small doses.  But I think the
> more people that are around him, the more activity and stuff, the
> more he's going to fall and we're going to end up having an incident
> where someone's going to get hurt.  That's my thing, my fear is that
> we're going to have him in a situation where someone gets really hurt
> or he gets hurt or he's so depressed I end[] up finding him dead.

(Tr. 61.)

### 3. The Vocational Expert's Testimony

The ALJ solicited testimony from a vocational expert ("VE") to determine whether jobs

would be available for someone with varying functional limitations.  The VE offered testimony

about job availability for a hypothetical individual of Plaintiff's age, education, and work experience

who was capable of "working at all exertional levels but would be limited to jobs [involving] only

superficial interpersonal contact with co-workers and supervisors, no contact with the public and

only simple, repetitive tasks involving one or two step instructions." (Tr. 62.) The VE testified that

there would be work available to such an individual and provided examples of assembler and

machine operator.  (Tr. 62-63.)

The ALJ then asked the VE to consider a much more limited hypothetical individual:

> this person has marked restrictions in the following areas[,] and I
> define marked as having no useful vocational function, maintaining
> attention and concentration, relating adequately to supervisors and
> co-workers and tolerating stress and responding adequately to routine
> changes in the work setting.

(Tr. 63.)  The VE testified that no jobs would be available to such an individual.  (Tr. 63.)

12

## II. THE ADMINISTRATIVE LAW JUDGE'S FINDINGS

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) and Supplemental Security Income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the

analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ Patterson found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of January 2, 2002. (Tr. 14.)  At step two, he found that Plaintiff had the following severe impairments: "attention deficit hyperactivity disorder; intermittent explosive disorder; depression; and narcissistic personality disorder." (*Id.*)  Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 15.)  Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform

> a full range of work at all exertional levels but with the following nonexertional limitations: he is limited to only superficial interpersonal contact with coworkers and supervisors and no contact with the public; and he is limited to only simple repetitive tasks involving one or two step instructions.

(Tr. 17.)  At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. 23.)  At step five, the ALJ found that sufficient jobs existed in the national economy for someone of Plaintiff's age, education, work experience, and residual functional capacity. (Tr. 23-24.)  The ALJ therefore concluded that Marthaler was not disabled as defined by the Social Security Act. (Tr. 24.)

## III.  STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply

the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). In deciding whether substantial evidence supports the ALJ's decision, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800

15

F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by The Courts" (internal quotation marks omitted)).

## IV. ANALYSIS

Mr. Marthaler raises one claim of error on appeal: he says that the ALJ did not comply with the procedural aspect of the "treating physician" rule. (*See* Pl.'s Mot. Summ. J. at 3-7; Pl.'s Reply to Def.'s Resp. to Pl.'s Mot. Summ. J. at 2.) Plaintiff maintains that the ALJ's sole rationale for rejecting Dr. Lenhart's opinion was that it was "'not supported by [the] evidence as a whole.'" (Pl.'s Mot. Summ. J. at 5 (quoting Tr. 22).) While the ALJ said more than that, the Court agrees with Plaintiff's fundamental point: the ALJ did not adequately articulate why Dr. Lenhart's opinion was given "little weight." Remand is therefore warranted.

The treating-source rule generally requires an ALJ to give deference to the opinion of a claimant's treating source. In particular, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)); *see also* S.S.R. 96-2p, 1996 WL 374188 (1996). And where an ALJ finds that a treating physician's opinion is not entitled to controlling weight, he must then consider and apply the following non-exhaustive list of factors to determine how much weight to give the opinion: (1) "the length of the treatment relationship and the frequency of examination," (2) "the nature and extent of the treatment relationship," (3) the relevant evidence presented by a treating physician to support his opinion, (4) "consistency of the opinion with the record as a whole," and (5) "the

specialization of the treating source." *Id.*; 20 C.F.R. § 404.1527(c)(2).

In addition, and as most relevant here, the treating-source rule contains a procedural, explanatory requirement that an ALJ give "good reasons" for the weight given a treating-source opinion. *See e.g.*, *Wilson*, 378 F.3d at 544; *see also* S.S.R. 96-2p, 1996 WL 374188, at *5 (providing that a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record"). The purpose for this procedural requirement is two- fold:

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

*Wilson*, 378 F.3d at 544 (internal quotation marks omitted); *see also* S.S.R. 96-2p, 1996 WL 374188, at *5.

In analyzing Dr. Lenhart's opinion, ALJ Patterson provided:

> On December 18, 2009 Harold Lenhart, M.D., the claimant's treating psychiatrist, opined that the claimant is not capable of entering full time into the work force. He noted that the claimant is not capable of working in proximity to others, cannot attend or concentrate for extended periods of time; and is not able to accept any form of criticism or disruption of routine. Dr. Lenhart further opined that the claimant qualifies for total and permanent disability status.

> Dr. Lenhart also completed a mental impairment questionnaire on December 22, 2009. He opined that the claimant would have difficulty working at a regular job on a sustained basis due to poor concentration, hypersensitivity to criticism and irritability. . . . Dr. Lenhart noted that the claimant was markedly limited in three components of sustained concentration and persistence, particularly the ability to maintain attention and concentration for extended

17

periods, the ability to work in coordination with or proximity to others without being distracted by them, and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without en unreasonable number and length of rest periods. He also noted that the claimant was markedly limited in one component of social functioning, the ability to interact appropriately with the general public, and that he was in one component of adaption, the ability to respond appropriately to change in the [work] setting. Furthermore, Dr. Lenhart noted that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate. . . .

Whether an individual is disabled is a finding that is reserved to the Commissioner. The definition of disability involves legal, medical and vocational issues and physicians, treating or otherwise, do not always take all these issues into consideration. While the Administrative Law Judge recognizes that Dr. Lenhart is a treating psychiatrist with a longitudinal understanding of the claimant's impairments, the undersigned is not bound by his opinion on the ultimate issue of disability.

The Administrative Law Judge does find Dr. Lenhart's implied assessment of the claimant's ability to perform basic work activities as being severely restricted [is] entitled to little weight as it [is] not supported by the evidence as a whole.

(Tr. 22.) The ALJ then immediately turned to a discussion of Dr. Hill's opinion. (*Id.*)

As an initial matter, the parties do not dispute that it was within the ALJ's discretion to reject Dr. Lenhart's statements about Plaintiff's ability to work. (*Compare* Def.'s Mot. Summ. J. at 11 *with* Pl.'s Mot. Summ. J. at 4.) And the case law is in accord: the ultimate disability determination rests with the ALJ — even when a treating-source opines that a claimant is disabled. *E.g., Brock v. Comm'r of Soc. Sec.*, 368 F. App'x 622, 625 (6th Cir. 2010) (holding that ALJ did not inappropriately disregard treating physician's statement that claimant was "100% disabled" because the regulations reserved this determination to the Commissioner (citing 20 C.F.R. § 404.1527(e)(1), (e)(3))). Accordingly, the ALJ reasonably concluded that he was "not bound by [Dr. Lenhart's]

18

opinion on the ultimate issue of disability." (*See* Tr. 22.)

The problem here, however, is that Dr. Lenhart opined on much more than whether Plaintiff could work, and the ALJ's narrative does not sufficiently address Dr. Lenhart's specific functional limitations. As quoted above, after two paragraphs of factual summary and one about who makes the ultimate disability determination, the narrative states: "The Administrative Law Judge does find Dr. Lenhart's implied assessment of the claimant's ability to perform basic work activities as being severely restricted entitled to little weight as it not supported by the evidence as a whole." (Tr. 22.) This is conclusory. It does not comply with the explanatory requirement of the treating-source rule because it does not identify which findings of Dr. Lenhart (e.g., that Plaintiff had "marked" limitations in accepting instructions and responding appropriately to criticism from supervisors) are undermined by which evidence. *See Rife v. Comm'r of Soc. Sec.*, No. 11-1461, 2012 WL 2149794, at *2 (6th Cir. June 13, 2012) (finding that ALJ's statement, "[i]n Dr. Voelpel's opinion, the restrictions identified by Dr. Hall (the treating family physician) are not supported by objective evidence," failed to provide "good reasons" for rejecting treating-source opinion); *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) ("Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick.").

And even if the Court were to find that the ALJ sufficiently explained why he gave Dr. Lenhart's opinion less than controlling weight, it remains that the ALJ failed to adequately demonstrate that he considered and balanced the factors set forth in 20 C.F.R. § 404.1527(c)(2). *See Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) (providing that, before rejecting a treating-source

opinion, an ALJ must "conduct the balancing of factors to determine what weight should be accorded these treating source opinions"); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors . . . ."). For instance, there is no discussion about how frequently or how long Plaintiff saw Dr. Lenhart, "the kinds and extent of examinations and testing the source has performed," or what evidence Dr. Lenhart offered to support his opinion. *See* 20 C.F.R. § 404.1527(c)(2). Although there may be cases where an ALJ need not explicitly discuss each § 404.1527(c)(2) factor, *see Klimas v. Comm'r of Soc. Sec.*, 1:10-CV-666, 2012 WL 691702 (W.D. Mich. Mar. 1, 2012), the ALJ's statement that Dr. Lenhart's opinion is "not supported by the evidence as a whole" does not suffice even under this more lenient application of the treating-source rule.

The Commissioner disagrees with this characterization of the ALJ's narrative and directs the Court's attention to the ALJ's discussion of Dr. Hill's opinion immediately following the rejection of Dr. Lenhart's opinion. (ECF No. 10, Def.'s Mot. Summ. J. at 12.) After summarizing Dr. Hill's opinion, the narrative states, "The Administrative Law Judge gives [Dr. Hill's] opinion weight as it is generally consistent with the medical record as a whole." (Tr. 22.) To the extent that the ALJ implicitly found that Dr. Lenhart's opinion should be given "little weight" because Dr. Hill's opinion contradicted it, this would not be an appropriate treating-source analysis. *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009) ("Nothing in the regulations indicates, or even suggests, that the administrative judge may decline to give the treating physician's medical opinion less than controlling weight simply because another physician has reached a contrary conclusion. . . . If the existence of such a conflict is enough to justify denying the treating physician's report controlling

weight, it would be a rare case indeed in which such weight would be accorded.").

In addition to relying on the ALJ's analysis of Dr. Hill's opinion, the Commissioner asserts that the ALJ's reasoning for assigning Dr. Lenhart's opinion "little weight" "is evident throughout the . . . decision." (Def.'s Mot. Summ. J. at 12.) In support of this claim, the Commissioner points to the ALJ's summary of the medical evidence and the ALJ's discussion of Plaintiff's activities of daily living. (*See id.* at 12-14.) The problem with the Commissioner's argument, however, is that the ALJ's summary of the medical evidence does not explain how the evidence undermines Dr. Lenhart's opinion. (*See* Tr. 18-22.) The same can be said about the ALJ's discussion of Plaintiff's activities of daily living: the ALJ simply did not contrast Plaintiff's ability to perform those activities with Dr. Lenhart's functional limitations. (*See* Tr. 20-22.) The Commissioner may be correct that what the ALJ said about Plaintiff's medical evidence and activities of daily living could also justify the ALJ's rejection of Dr. Lenhart's opinion; but it was the ALJ's job — not the Commissioner's task on appeal — to make the requisite tie. *See Crowther v. Comm'r of Soc. Sec.*, 1:11-CV-394, 2012 WL 2711041, at *12 (July 6, 2012), *report and recommendation adopted by* 2012 WL 3113324 (S.D. Ohio July 31, 2012) ("[T]he Commissioner's post hoc rationalizations for the ALJ's actions cannot supplant the ALJ's omission in this case."); *Potts v. Astrue*, No. 3:07-CV-1284, 2009 WL 2168731, at *4 (M.D. Tenn. July 17, 2009) ("In his response to the Plaintiff's motion, the Commissioner does a fine job of pointing to all the parts of the record that could be construed as inconsistent with the treating source's opinion as well as to the evidence in the record generally supporting the ALJ's conclusion that Plaintiff is not disabled. As Plaintiff correctly argues in his reply brief in support of his motion before this Court, however, the fact that the Commissioner can advance post hoc arguments in support of the ALJ's decision is immaterial.").

Nonetheless, the Court recognizes that the procedural aspect of the treating-source rule is not "procrustean bed, requiring an arbitrary conformity at all times." *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010). And there are cases where the ALJ's failure to fully comply with the explanatory aspect of the treating source rule might be overlooked. *See Wilson*, 378 F.3d at 547. This might include, for example, "where the Commissioner has met the goal of § 1527(d)(2) — the provision of the procedural safeguard of reasons — even though she has not complied with the terms of the regulation." *Id.* at 547; *see also Friend*, 375 F. App'x at 551 ("If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused.").

But to the extent that the Commissioner relies on portions of the ALJ's narrative that do not explicitly discuss Dr. Lenhart's opinion to invoke a harmless-error safe-harbor, any implicit attack by the ALJ on Dr. Lenhart's opinion does not provide the Court "a clear understanding," *Friend*, 375 F. App'x at 551, of the reasons for the weight assigned Dr. Lenhart's opinion. As discussed by the Commissioner, the ALJ cited medical records from 2007 and 2008 indicating that Plaintiff's "focus and concentration were fair or good." (Tr. 19; *see also* Tr. 324, 325, 404.) The ALJ also found that a November 2006 treatment record showed that Plaintiff was progressing toward controlling his anger and behaving maturely and that September 2009 notes "show that [Marthaler] reported that the frequency of his explosive episodes was decreasing." (Tr. 19, 344, 346.) In terms of activities of daily living, the ALJ found:

> [T]he claimant has admitted that he can do the following: be involved in multiple aspects of caring for his offspring; prepare meals; wash dishes, clean floors, and do yard work with encouragement; watch television; and lift weights. Although he alleges great difficulty

22

dealing with others, he previously lived with his ex-girlfriend and their children and currently lives with his mother and brother. He also goes to church, goes shopping in stores, and plays cards with others a couple times a month. (Exhibits 5E, p.6 and 6E, pp.5-12) Moreover, he testified that some of his former employers, family friends, re-hired him on at least one occasion, despite his difficulties with other persons at that employment site. There is also no medical evidence that shows that the claimant has any difficulty with sitting or talking.

The notes also show that he can spend time in busy locations, and still maintain some personal limits. The November 8, 2006 record revealed that he had gone to the casino and was able to prevent himself from gambling too much. (Exhibit 4F, p.26)

(Tr. 20-21.)

Even if these findings are accepted, they do not adequately demonstrate why the ALJ believed that Dr. Lenhart's opinion was "not supported by the evidence as a whole." (Tr. 22.) Dr. Lenhart found that Plaintiff had "marked" limitations, i.e., "cannot usefully perform or sustain the activity," in five mental-functioning categories. (Tr. 441-42.) Two are of particular interest: (1) accepting instructions and responding appropriately to criticism from supervisors and (2) responding appropriately to changes in the work setting. (Tr. 441-42.) Even if, as the ALJ found, Plaintiff was able to concentrate at the fair-to-good range, care for his child, perform yard and housework, attend church, play cards, and live with others, it is not plain how Plaintiff's ability to perform these tasks undermine (at least) these two findings by Dr. Lenhart. Without further explanation from the ALJ, none of the foregoing appears to test Plaintiff's ability to accept instruction or criticism or adapt to changes in day-to-day work-related tasks. It is true that the ALJ made some factual findings indicating that Plaintiff was better able to cope with his anger. (*See* Tr. 19.) But these general statements are not specific to Plaintiff's ability to appropriately react to supervisor instruction or criticism, or work-place changes. Moreover, the ALJ did not explain why Plaintiff's *improvement*

23

in this regard meant that Plaintiff was not still severely or, in Dr. Lenhart's opinion, "marked[ly]" impaired.   Indeed, Dr. Lenhart's treatment notes reflect that he was aware that Plaintiff's medications were helping and that Plaintiff reported feeling "less angry and irritable."  (Tr. 381, 438.)   Lenhart nonetheless issued his opinion indicating marked limitations in five mental-functioning categories.  Moreover, the most recent counseling record before the ALJ provides that Plaintiff was irritable, tired, depressed and slightly regressing in his ability to control his anxiety, anger, and depression.  (Tr. 435.)

In sum, because the ALJ did not comply with the procedural aspect of the treating-source rule in evaluating Dr. Lenhart's opinion, remand is warranted — even if substantial evidence supports the ALJ's disability determination.  *See Rogers*, 486 F.3d at 243 ("[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."); *Sawdy v. Comm'r of Soc. Sec.*, 436 F. App'x 551, 553 (6th Cir. 2011) (noting that the course of action for failure to comply with the "good reasons" requirement is now "well charted" in the Sixth Circuit: "when an ALJ violates the treating-source rule, '[w]e do not hesitate to remand,' and 'we will continue remanding when we encounter opinions from ALJ [s] that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion.'" (quoting *Hensley*, 573 F.3d at 267)).

Lastly,  Plaintiff argues that reversal for an award of benefits, rather than a remand for further administrative proceedings, is justified.  But the Sixth Circuit has made clear that "[a] court can reverse the decision and immediately award benefits only if all essential factual issues have been

24

resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec'y of Health & Hum. Servs.*, 17 F.3d 171, 176 (6th Cir. 1994). Here, Marthaler implies that no further fact finding is necessary because Dr. Lenhart's opinion, along with testimony from Marthaler's mother and the VE, demonstrate that no jobs would be available to him. (*See* Pl.'s Mot. Summ. J. at 8-10.) But this would only be true if certain of Dr. Lenhart's findings are entitled to controlling weight. (The VE testified that there would be no jobs for someone who had marked restrictions in the following areas: (1) maintaining attention and concentration, (2) relating adequately to supervisors and co-workers, (3) tolerating stress, and (4) responding adequately to routine changes in the work setting. (Tr. 63.)) The Court does not believe the record plainly demonstrates the absence of substantial evidence supporting a decision to discount some of Dr. Lenhart's functional limitations. As noted above, the ALJ cited medical records supporting his residual functional capacity assessment and some of these records (arguably, at least) weigh against Dr. Lenhart's findings. It is therefore best for the ALJ to first explain which of Dr. Lenhart's findings, if any, should be discredited (and why), and then, if necessary, revise his residual functional capacity assessment of Plaintiff to account for Dr. Lenhart's opinion. This in turn may trigger the need for additional vocational expert testimony. Accordingly, an award of benefits is not now proper.

## V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that the ALJ did not adequately articulate his reasons for rejecting the opinion of Plaintiff's treating psychiatrist. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 9) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (ECF No. 10) be DENIED, and that,

pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).


s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated: October 1, 2012

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on October 1, 2012.

s/Jane Johnson_____
Deputy Clerk